No. 36,305

THE STATE OF KANSAS, *Appellee*, v. HASSELL R. McCOY, *Appellant*.

(160 P. 2d 238)

Opinion filed July 7, 1945.

*F. C. Norton* and *W. S. Norris*, both of Salina, argued the cause, and *Bryan J. Hoffman* and *John Hamilton Wilson*, both of Salina, were on the briefs for the appellant.

*F. J. Bretlle*, special prosecutor, argued the cause, and *W. H. Young*, county attorney, was on the briefs for the appellee.

The opinion of the court was delivered by

HOCH, J.: This is an appeal from a conviction of murder in the second degree.

In the early morning of April 11, 1944, the police were called to the home of Hassell R. McCoy, the appellant, in Salina, Kan., and found his wife, Evelyn McCoy, lying on the floor mortally wounded. She was unconscious and died very soon after their arrival. The only other person there when they arrived was the appellant, who was leaning over the prostrate form of his wife apparently making an effort to revive her. He was taken into custody and subsequently tried on a charge of murder in the first degree. Appellant's defense was that he had accidentally killed his wife while demonstrating to

her, at her request, how to use a revolver. At the close of the state's evidence the defendant moved to discharge the jury, which motion was overruled.

The defendant rested his case without offering any testimony or other evidence. Among other.instructions the court instructed the jury as to murder in the first degree, murder in the second degree, and as to manslaughter in the third and fourth degrees. No complaint is made that instructions were not given as to other crimes of lesser degree than murder in the second degree.

A verdict of murder in the second degree was returned, a motion for a new trial was filed and overruled, judgment was entered on the verdict and the defendant was sentenced "for a term of fifteen years and until such time as he shall be discharged by law." This appeal followed.

Appellant's principal contentions are that there was no substantial evidence showing that the act was committed purposely and maliciously and that the court erred in instructions given and in refusing to give certain instructions requested.

We first consider the evidence. It is elementary that we do not weigh conflicting evidence. That is a province of the jury. We examine the record to determine whether there is an entire absence of substantial evidence proving or tending to prove some essential element of the crime. If from all the facts and circumstances disclosed by the evidence the jury might reasonably draw an inference of guilt, a verdict of guilt will not be disturbed. (*State v. Long,* 148 Kan. 47, 79. P. 2d 837.)

What was the evidence upon which the state relies? The gravity of the issue, both from the standpoint of the defendant and of the state demands that the record be examined thoroughly, with greatest care, and without prejudice. That we have sought to do. No purpose would be served by full recital of the evidence. Brief extracts from the testimony will be given, and other evidence which the state contends supports the verdict will be summarized.

On the evening of April 10, 1944, McCoy and his wife attended a party held at a place in Salina called Dreamland. Five or six couples were present. Several witnesses testified that there was argument between them during the evening. One of those present at the party testified:

"Q. Tell the court and jury, please, in your own language, what. you saw and what you heard between McCoy and his wife that evening? A. I was

sitting in this booth, facing the south and I heard a little noise, and I looked around just in time to see Mr. McCoy slap his wife and his wife slap him and him slap her. . . . .

"Q. Did you observe anything else there that evening between McCoy and his wife? A. More than I seen her walk over to the door and Mr. McCoy walk over and reach over and get her by the arm and bring her back. . . .

"Q. You say she walked over to the door? A. Yes, sir.

"Q. What did she do next? A. Mr. McCoy went over and took her by the arm and brought her back over and they was sitting there talking.

"Q. Did he say anything to her that you heard? A. No, sir; I couldn't hear anything they was saying.

. . . . . . . . . . . . . . . .

"Q. Tell the court and jury, please, whether or not anything else happened between McCoy and his wife that evening? A. Nothing more that I saw; or heard.

"Q. How many times did McCoy, if you know, strike his wife there that evening?

"Mr. Norton: That is objected to as repetition.

"A. Twice.

. . . . . . . . . . . . . .

"Q. Now, you say you saw Mr. McCoy slap her? Was it hard enough to cause any bruises on her body? A. Not that I could see.

"Q. Just kind of a little love tap, is that right?

"Mr. Brettle: Objected to as leading the witness.

"Mr. Norton: This is cross-examination.

"The Court: This is cross-examination. Overruled.

"A. I wouldn't know whether you would call it a love tap or not. It looked like he used his wrist more than anything else.

"Q. Just kinda slapped her like that? (Indicating). A. I was too far off to hear anything. In fact, I just looked around when that happened.

"Q. It wasn't enough that any of the parties around there rushed up and grabbed Mr. McCoy, was it? A. Not that I saw.

"Q. And then she struck him back? A. Yes, sir.

"Q. And then he boxed her again, is that right? A. Yes, sir."

Another witness testified:

"Q. You say Mrs. McCoy started to go out the door, is that it? A. Yes, sir.

"Q. All right. A. And Mr. McCoy brought her back in.

"Q. Do you recall how he brought her back? A. He just put his arms around her and brought her back in.

"Q. What, if anything, happened after he brought her back into the room? A. He talked to her there at the door a little bit. I was away from them.

"Q. You didn't hear that conversation? A. I didn't know what was said; no, sir.

"Q. What next happened? A. Mr. McCoy went on back in the little room it seems to me, and began talking with some of the other men. There was Mr. Scheidt and Mr. Lykke back in that little partition.

"Q. What next happened? A. The next thing, Mrs. McCoy seemed to take her arm and threw the glasses or bottles, whatever it was, that was setting on the bar there. Seemed to brush them off on the floor.

"Q. Anything further happen? A. In a few minutes or right along that time, she hurled a glass or bottle or something through the air, because it struck.

"Q. What further happened? A. Well, then things seemed to quiet down.

"Mr. Norton: Just a moment, that is objected to as a conclusion.

"The Court: I am going to let her answer the question. Go on and answer it and I will cut it out if it is necessary.

"A. And then Mrs. McCoy made a rush at Mr. McCoy, grabbing him by the hair like this. (Indicating) Mr. Scheidt took Mrs. McCoy and pulled her back, and I stepped in front of Mr. McCoy.

"Q. What did you say to Mr. McCoy? A. I said, 'This isn't a very nice farewell party to be acting like this.'

"Q. Did they say anything to you? Either McCoy or his wife say anything in answer to that question? A. I think Mr. McCoy said, 'I'm sorry.' I wouldn't swear, but I think he said, 'I'm sorry.'

"Q. Did anything further happen that evening between McCoy and his wife? A. No, I think that was about all."

Another witness testified:

"Q. And what did you hear and what did you see? A. Well, I knew they were arguing. I couldn't tell what they were arguing about because I couldn't hear them.

"Mr. Norton: Just a moment, that is objected to as not responsive to the question.

"The Court: Overruled. Proceed and answer the question.

"A. They were fussing. I could tell by the tone of their voice, but what they were fussing about, I don't know.

"Mr. Hoffman: Just a minute, that is stating a conclusion of the witness, if your Honor please.

"The Court: Overruled.

"Q. Go ahead and tell your story. A. Well, they were just fussing. I don't know what it was about or why or anything.

"Mr. Hoffman: We object for the same reason. Let her tell what happened. She can tell what was said or done.

"The Court: She is telling what she knows. She doesn't tell what you think she ought to tell, but she is telling what she knows. Proceed and answer the questions. Is that all you saw? A. Well, there were some pop bottles thrown. Who threw them I don't know.

.    .    .    .    .    .    .    .    .    .    .    .    .

"Q. During a considerable portion of the time you were there, there was an argument between McCoy and his wife, is that right? A. At times, yes.

"Q. In other words, it continued during the course of the evening?

.    .    .    .    .    .    .    .    .    .    .    .    .

"A. Yes, there was arguing. But at times they were—well, as you say, they was loving.

"Q. At times it would die down and then it would start up again? A. That's right."

None of the witnesses who had been guests testified as to the time when the McCoys left the party.

Ervin Hindman, a Salina patrolman, was in a patrol car with Dallas Wyatt, another patrolman, when they received a call at 4:41 a. m. to go to the McCoy home. From Hindman's testimony we take the following:

"A. As we got out of the car and stepped up on the porch and got to the door and saw Mr. McCoy astraddle Mrs. McCoy who was lying on the floor, and as he looked up and saw us, he got up and come to me and said 'My God, Erv, I've shot my wife.' He was in his pajamas. She was in a bathrobe. Nothing else. She was lying on the floor on her back in the dining room just west of the dining room table, her head toward the east and her feet toward the west. I believe there was a table cloth, a billfold, a quart beer bottle and a glass or two on the table.

"Q. Mr. Hindman, when you arrived at the McCoy home, can you tell the jury whether or not Mrs. McCoy was still alive? A. She took two gasps after we arrived there.

"Q. What happened then? A. I went back out to the car and radioed to the station to the desk sergeant.

·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"Q. Was Mrs. McCoy conscious when you got there? A. No, sir.

"Q. What did McCoy say to you when you first went into the home? A. He said 'My God, Erv, I've shot my wife.'

·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"Q. Did you see a gun there? A. Not until after I had been outside to the radio.

"Q. What was the condition of McCoy's garments as to whether there was any blood on the same? A. There was some blood on his pajamas.

"Q. Was there blood on his hands? A. Yes, sir.

"Q. What did you do after you used the radio? A. I went back in and told Mr. McCoy that the sergeant ordered us to bring him in and he would have to go with us to the station.

"Q. What did you next do as regards McCoy? A. He slipped on his shoes and walked out with us and got into the car and we took him to the station.

·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·    ·

"The lights were on in the front room, living room and I think (I am not positive) that they were on in the bedroom. Mr. McCoy was in a very excited condition. And he said his wife had been reading some kind of a book where there had been some shooting and she told him he had ought to show her how to shoot a gun, and he was showing her when it went off. He was booked in at the station at 4:55 o'clock. There were some clothes hanging on the back of the chair that I recalled were his and there were some ladies' clothes around. It had been raining very hard and there was water standing in the street. The robe had been pulled open and I could see the wound on

her left shoulder. Saw blood on Mrs. McCoy's face and on Mr. McCoy's pajamas. Mostly on the upper right side. He had some on his legs where it looked like he had raked his hands. The doors were not locked. He asked me more than once to get a doctor. His condition was extremely nervous. Even after he was in jail he said 'My God, get a doctor and see if something can't be done for her.' "

In addition to testimony corroborative of Hindman's testimony Wyatt testified that the first room as you enter the home is a living room with a bedroom to the left. Mrs. McCoy was lying on the floor in the dining room with her head next to the table and her feet at the edge of the door into the kitchen, which was to the left of the dining room. On the east side of the living room was a studio couch with a pillow on it and a "blanket laying on there like some one had been laying on it." The bed in the bedroom "had been mussed up." The dining room is entered from the living room through an archway. In the northwest corner of the dining room was a typewriter on a stand and a chair. In the north side of the room was a buffet and in the southeast corner a combined clothes closet and china closet. There was a chair on the south side of the dining room table. There was blood in front of the chair by the typewriter. His testimony is somewhat confused as to whether he took the gun from McCoy's hand or from the table. He broke the gun and took out the two shells that were in it. Only one had been fired. McCoy said: "Why did I ever own a gun? . . . I have a notion to kill myself."

He testified that there was a bullet wound just below the collar bone, about an inch and a half or two inches to the left of the median line; that the bullet went through and came out just below the left shoulder blade; that there were no powder burns on Mrs. McCoy's body nor on the robe she was wearing.

Guy L. Whitford, sergeant of police, testified to many of the same facts heretofore related. In addition he testified that he searched for bullet holes in the northwest corner of the room and found none there; that he found quite a few bullet holes elsewhere in the house but did not say at what places; that Mrs. McCoy's clothing was lying around in the several rooms and that appellant's pants were on the dining room table, and that he saw socks and other clothing; that the house was badly torn up; that the pillow on the couch was at the head and "kinda folded up" and the blanket lying at the foot of the couch was "kinda thrown in a pile"; that after he had gone back to the station he asked appellant where in the house the shoot-

ing occurred and that appellant said it was in the northwest corner of the dining room, and that he was showing his wife how to handle a gun or how to shoot a gun.

Paul Shanahan, sheriff of Saline county, testified that he reached the McCoy home at about five o'clock on the morning of the tragedy. He described the rooms and the furniture substantially as preceding witnesses had done. As to the couch and the scattered articles of clothing he testified somewhat more in detail, as follows:

"Along the east wall was a davenport, with some bedding on it, it looked as if it might have been prepared for someone to sleep there. There was articles of clothing scattered about. Oh, there was a lady's slip, lady's hose, I believe a lady's brassiere, all in the living room. In the dining room there was a man's trousers, laid over the south side of the table, a man's shirt on the chair, some hose dropped around on the floor."

He also testified that the appellant had told him that the shooting took place in the northwest corner of the dining room and that he examined that part of the room thoroughly and found no bullet holes there. He then testified that he found a bullet hole in the right front door of the cabinet in the *southeast* corner of the room and found the bullet lying upon some clothing, mostly ladies' clothing, inside the cabinet. The bullet hole was about eighteen inches from the floor. Upon opening the cabinet door he saw the chips which had been knocked off the back side of the door. He said that it had rained practically all night, that the streets were wet, and that he found the damp garments scattered over the three rooms.

The cabinet door and various articles of clothing which appellant had been wearing were introduced in evidence.

Further testimony of Sheriff Shanahan was as follows:

"Q. Now, Mr. Sheriff, what did this defendant tell you as to what he was doing and what his wife was doing at the time of this shooting? A. We first talked to Mr. McCoy at the city jail, shortly after noon of April 11. We asked him if he would tell us what happened at this—out at his home. He said, 'Sure, I'll be glad to tell you what happened.' He says, 'I just want the truth to come out and I have nothing to hide.' He said, 'My wife Evelyn had been reading a detective story and—'

"Q. Pardon me, sir, did he tell you what time it was the shooting took place? A. He didn't say the time. The hour. But he said it was that morning.

"Q. All right. A. That his wife had been reading a detective story and she said 'Honey, why don't you teach me to shoot your gun? Sometime I may want to shoot it. Or use it when you are not here.' He said, 'I'll try and teach you how to fire it.' He said, 'Evelyn was sitting in the chair in the northwest corner of the living room, he said, I was sitting in the chair on the

south side of the table in the dining room. If I said living room for Mrs. Mc-Coy I meant dining room.

"Mr. Coyne: Yes.

"A. (continuing) He said, 'I got up and went around the table, opened the top drawer of the buffet, took out my revolver from the holster in the top drawer of the buffet.' —and at that time I asked him if it was his Colt, revolver, and he said it was. 'Removed the revolver from its holster and put the holster on top of the buffet; that the gun contained two cartridges in the cylinder'; that he stood before her and started to demonstrate how to handle the revolver and that some way his thumb slipped off the hammer and the gun discharged. She said 'Daddy, it went off. Hold me, kiss me.' And she sank to the floor."

. . . . . . . . . . . . . .

"Q. Did he state to you how far he was away from his wife when the gun went off? A. He said he didn't know exactly, but two to three feet.

"Q. Two to three feet. Mister Sheriff, are there any powder burns—you have examined State's Exhibit Nine, are there any powder burns on the three bullet holes in that chenille robe? A. I could find no evidence of powder burns.

. . . . . . . . . . . . . .

"Q. Did he tell you anything as to what occurred out there at Dreamland the night before? A. No, only that they had had a party for Mr. Scheidt who was going to the service."

. . . . . . . . . . . . . .

"Q. What was his demeanor when he was telling you how this shooting took place? A. He seemed to be collected. He seemed to be sober. He seemed to be rational. He seemed to have full control of his faculties.

"Q. Did you ask him in your conversation with him what time he and his wife got home that morning? A. I did ask him that. And his answer he thought it was around two o'clock."

Edgar W. Heyl, chief of police, testified that he talked to appellant at the city jail on the morning of the eleventh. At that time appellant said he and his wife went to the party at about ten thirty the night before the shooting; that the people there danced and did some drinking; that he and his wife did not dance; that there was no disturbance of any kind at the party and that he and his wife had no trouble of any kind; that they got home "possibly around twelve thirty." The witness then related appellant's story to him of what happened. Material parts of this testimony were as follows:

"Q. Then did you ask him what occurred when he got home that night? A. Yes, sir.

"Q. What did he say to that? A. He said that it had been raining and he drove up out in front of the house, got out and locked the car, went into the house and undressed, and then he and his wife sat at the table and talked.

"Q. Did he tell you what he put on and what his wife put on? A. He said he had undressed in the living room and his wife had gone into the bedroom

and undressed. And he had put on his pajamas and she had put on a robe. I think they call them a chenille robe.

"Q. Then what did he say occurred? A. He said his wife came out of the bedroom, he was sitting south of the table in the dining room, and she came over and sat down at the table in the northwest corner of the dining room facing him.

"Q. In the northwest corner? A. Yes.

"Q. Did he state what she sat in? A. Well, a chair that was there.

"Q. Yes, go ahead, Mr. Heyl. A. I asked him what he was talking about and he said, oh, general things, business, and one thing that was bothering her was a detective story that she had been reading. And she said a few nights before she had heard a gate open and it scared her, and she made the remark 'Daddy, you have never shown me how to shoot your pistol,' so he said 'I'll show you.'

"Q. Did he tell you where he got the gun? A. Yes, he did.

"Q. What did he say? A. He said he got up out of the chair and walked around to the east end of the table and opened a drawer in a buffet, took out his pistol out of the holster, came back around the east end of the table to where he had been sitting and walked around in front of his wife.

"Q. Did he state where his wife was sitting at that time? A. He said she was still sitting in that same chair.

"Q. In the northwest corner? A. In the northwest corner of the dining room, Sir.

"Q. Go ahead, sir. A. He said he stood before her with this gun and he demonstrated how he did it.

"Q. Did he state at that time how close he was to her? A. Well, he said he didn't know, possibly three or four feet; He wasn't sure.

"Q. Go ahead. A. He said he took the gun, turned the gun over and told her, he says 'Now, see here, honey, the first thing to do is to make sure that the hammer is resting on the empty shell. You pull the hammer back and revolve the cylinder till it rests on the empty shell. He says, as I let the hammer down it slipped from under my thumb and that's when it happened.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Did he state to you in which direction the gun was pointed when he was demonstrating with his thumb on the hammer of the gun? A. Yes, sir, he said he was facing his wife and the gun was pointed *northwest*." (Italics supplied.)

Chief of Police Heyl also testified as to the condition in which he found the rooms. He said that the bed was "very much disarranged"; that there was a slat lying on the floor—"one end of it"; that he examined thoroughly and found no bullet holes in the northwest corner of the room; that he found a pair of ladies' gloves and and a pair of ladies' hose lying on the chair in the kitchen; that the dining room was about eleven feet wide; that he carefully examined the chair in the dining room and found no stains or marks of any sort on it; that on the dresser in the bedroom he found a ring (which

was offered in evidence) which he "thought was a wedding ring." He further testified that he saw the bullet hole in the cabinet in the southeast corner of the room and that "the gun was held higher than the door to make this angle."

Heyl also testified:

"Q. Now you have in your employ in the city a man named Capt. Wickersham? A. Yes, sir.

"Q. He is a police officer? A. Yes, sir.

"Q. At the time that you were talking to Mr. McCoy, did Capt. Wickersham come into the police station and in the room where you were talking to McCoy? A. Just at the time we were finishing.

"Q. And did McCoy and Wickersham have some conversation? A. They did; yes, sir.

"Q. Can you state what that conversation was? A. Capt. Wickersham came to the door of the office, Mr. McCoy looked up and said 'Wick, I'm in trouble'; and Wick said 'I told you that was going to happen to you.' He said 'Do you remember the time, some time ago, that I went to the Paramount Bar and had to take you out of there when you threatened to kill your wife, and I told you you was too hot-headed and some day you was going to get in trouble?'

"Q. And what did McCoy say? A. He just hung his head."

Howard Wickersham, police captain, who said he had known the defendant a little over two years, testified:

"Q. Were you present or did you come into the police station on the day of April 11, this year, while the Chief of Police was talking to McCoy? A. I did.

"Q. What did you say to him, McCoy; and what did he say to you?

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. I said, 'You remember what I told you that other time I talked to you?' And he said, 'Yes, I do'; and he hung his head. And that was all."

D. K. Fitch, undersheriff, testified to a conversation had with appellant a day or two after the shooting. The appellant told him that the shooting occurred in the northwest corner of the room and repeated the story, heretofore related, as to the circumstances under which it took place. Appellant told him that he and his wife had gotten home late, and were about ready to retire, when she told him about the detective story she had been reading and said she thought she ought to know something about the use of a gun. Appellant said that his wife was sitting on a chair in the northwest corner of the room. Further testimony of the witness on this point was as follows:

"A. And he said he had started to show her how to work the pistol, to turn the cylinder and so on, and that it appeared that his thumb had just slipped

off of the hammer and then it happened. So I asked him if she was sitting down and he said that she was when she asked him to get it; but he said at the time that the thing happened he didn't know for sure whether she was sitting down or standing up, or raising up.

"Q. And that is about the gist of the conversation? A. Yes. . . . He had the appearance of being grieved."

The state's evidence stood unchallenged, the defendant offering no evidence. While the burden was upon the state to establish guilt beyond a reasonable doubt the jury was entitled to draw any reasonable inference from the evidence, including the element of intent. This right of the jury was not abrogated by the fact that under the instructions, properly given, it could not give weight to the appellant's failure to take the stand.

There was ample evidence of bad feeling at the party, of blows having been struck between appellant and his wife. And yet the testimony stands undenied that appellant told one of the officers that they had had no trouble of any sort that evening. The clothing scattered throughout the four rooms and the general appearance of disorder, and that both the bed and the couch had apparently been occupied, were circumstances that could be considered. It is argued that the clothing was scattered around to dry, but there was no testimony that such was the purpose. Appellant stated to several officers that the shooting took place in the northwest corner of the room, and that his wife was sitting in the chair there or was just getting up when the gun was accidentally discharged as he stood in front of her. One witness testified that appellant said the gun was pointed northwest when he was demonstrating with his thumb on the hammer. And yet the bullet was found inside a cabinet in the *southeast* corner of the room.

Again, the jury was entitled, in considering all the evidence, to put no credence in appellant's story that he was demonstrating to his wife the use of a pistol at four thirty in the morning, and in doing so had the hammer back and his thumb on it—all while it was pointed directly at her. Then there was the testimony as to the comment made to appellant by police officer Wickersham about a previous warning relating to threats against his wife and that he made no reply but simply hung his head. Appellant argues that the date of such threats was not fixed and that if made they may not have referred to the wife just deceased. But there was no evidence that there had been a prior wife, and the comment of the officer

would have had little meaning if there had been and the threats referred to her.

It is unnecessary to refer further to the evidence. We are unable to say that there was insufficient evidence to support the verdict—including its implied finding, under the instructions, of malicious intent.

We come to the instructions. Appellant offered no objections to the instructions that were given except to contend that the instruction given with reference to the failure to take the stand was not sufficient. We find no merit in that contention. The instruction given was as follows:

"The fact that the defendant has not taken the stand and testified in this case is a circumstance which cannot be considered by the jury as affecting either his guilt or his innocence, and the jury are not permitted to consider it or allude to it in your deliberations."

Upon motion for a new trial it was contended that two of the instructions requested should have been given. The first one was a requested instruction to the effect that the fact that the deceased was killed by the defendant was not alone sufficient to establish a malicious intent. There would have been nothing wrong in such an instruction, but the matter was fully covered in other instructions that were given, including an adequate definition as to what constitutes "malice" within the meaning of the statute. The second requested instruction to which reference was made in presenting the motion for a new trial related to the defendant's failure to take the witness stand, to which we have already referred. We find no error as to the instructions given or in the refusal to give instructions requested.

The judgment is affirmed.